IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**


Civil Action No. 08–cv–02792–MSK–KMT


FAIRFIELD DEVELOPMENT, INC., d/b/a FAIRFIELD DEVELOPMENT LP,
AXIS SURPLUS INSURANCE COMPANY,

     Plaintiffs,

v.

J.D.I. CONTRACTOR & SUPPLY, INC.,

     Defendant.

---

**ORDER**

---


     Defendant J.D.I. Contractor & Supply, Inc. ("J.D.I.") has filed a "Motion for Sanctions for Spoliation of Evidence." (Doc. No. 92 ["Mot."].) Plaintiffs Fairfield Development, Inc. ("Fairfield") and Axis Surplus Insurance Co. ("Axis") filed a response (Doc. No. 106 ["Resp."]) and J.D.I. filed a reply (Doc. No. 109 ["Reply"]). The court held an evidentiary hearing on July 21, 2010, prior to which Plaintiffs filed a supplemental brief. (Doc. No. 117.) The court has considered the briefing, along with the evidence presented at the evidentiary hearing. For the following reasons J.D.I.'s motion for sanctions is denied.

## BACKGROUND

This case arises out of a fire that occurred on January 13, 2008 at a construction site under the control of Fairfield and at which J.D.I. was working as a drywall subcontractor. The fire is attributed to a portable propane heater on the third floor of Building 6 at the construction site. Fairfield rented propane heaters for use at the construction site from Neff Rentals. Responsibility for the operation of the heaters on the day of the fire is in dispute. Plaintiffs seek to hold J.D.I. liable for the fire.

South Metro Fire Rescue responded to the call regarding the fire on January 13, 2008 and conducted an investigation on January 13 and 14, 2008. Jeffrey Atencio, the investigator for South Metro Fire Rescue, concluded that the fire was caused by a portable propane heater that was placed within six inches of a combustible wooden frame doorway. (Mot., Ex. A at 7.) Based on Atencio's investigation, the fire marshal issued a violation notice to Fairfield for improper use and location of the heater. (*Id.*)

An adjuster for Axis, Fairfield's insurance carrier, visited the site on January 14, 2008. Michael Ness, an out-of-state cause and origin investigator retained by Axis also visited the site. At the evidentiary hearing, Ness testified that he spent just a few hours at the scene on January 15, 2008, while it was still under the control of the fire department, then returned on January 21, 2008 to make observations and take photographs. He did not retain any physical evidence from the premises as it was still in fire department control, but he did obtain exemplar heaters from another part of the building, which he transferred to local cause and origin investigator Robert Toth when

he was later hired by Axis as a testifying expert. Ness never reached a formal written conclusion regarding the cause of the fire but informally came to the same conclusion as Atencio.

By the time Axis notified J.D.I. on February 12, 2008 of a potential subrogation claim, the third floor of the damaged structure and most of the fire debris had been removed.

J.D.I. seeks sanctions for spoliation of evidence on two grounds. First, J.D.I. claims that Plaintiffs failed to preserve the fire scene to allow it the opportunity to conduct an independent cause and origin investigation. Second, citing testimony from a former Fairfield employee that Fairfield had previously returned multiple heating units because of propane leaks, J.D.I. asserts that Plaintiffs failed to preserve the propane components—including the propane tank, hose fittings, regulator, and couplings—of the heater identified as the ignition source of the fire.[1] JDI argues that it is thus precluded from possible proof that the heater's leaking propane was the cause of the fire, rather than the heater's proximity to the wooden doorframe. As sanction, J.D.I. seeks dismissal of Plaintiffs' claims. In the alternative, J.D.I. asks the court to consider an adverse inference instruction or to preclude Plaintiffs from offering any expert testimony on the cause and origin of the fire.

## LEGAL STANDARD

"'Spoliation is the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" *Blangsted v. Snowmass-Wildcat Fire Prot. Dist.,* 642 F. Supp. 2d 1250, 1259–60 (D. Colo. 2009) (quoting *Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.,* 473 F.3d 450, 457 (2d Cir. 1999)). A court

---

[1] The heater itself was preserved by official fire investigator Atencio.

has both inherent power as well as authority under Federal Rule of Civil Procedure 37(b)(2) to

sanction a litigant for the destruction or loss of evidence. *See Chambers v. NASCO, Inc.*, 501 U.S.

32, 43-45 (1991); *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001); *Smith v.*

*Northwest Fin. Acceptance, Inc.*, 129 F.3d 1408 (10th Cir. 1997).

Sanctions for spoliation of evidence are appropriate when (1) a party had a duty to preserve

the evidence because it knew, or should have known, that litigation was imminent, and (2) the other

party was prejudiced by the destruction of the evidence. *Turner v. Pub. Serv. Co. of Colorado*, 563

F.3d 1136, 1149 (10th Cir. 2009). The burden is on the moving party to prove, by a preponderance

of the evidence, that the opposing party failed to preserve evidence or destroyed it. *See In re*

*Krause*, 367 B.R. 740, 764 (D. Kan. 2007). With regard to the duty to preserve, this Court has said

that, ordinarily,

> the duty to preserve evidence is triggered by the filing of a lawsuit. However, the
> obligation to preserve evidence may arise even earlier if a party has notice that future
> litigation is likely. The undeniable reality is that litigation is an ever-present
> possibility in our society. While a party should not be permitted to destroy potential
> evidence after receiving unequivocal notice of impending litigation, the duty to
> preserve relevant documents should require more than a mere possibility of
> litigation. Ultimately, the court's decision [on the duty to preserve] must be guided
> by the facts of each case.

*Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 621 (D. Colo. 2007) (internal

quotations and citations omitted). With regard to prejudice, this Court has said,

> The burden is on the aggrieved party to establish a reasonable probability, based on
> concrete evidence rather than a fertile imagination, that access to the lost material
> would have produced evidence favorable to his cause.

*Gates Rubber Co. V. Bando Chem. Indus., Ltd.*, 167 F.R.D. 90, 104 (D. Colo. 1996). "When deciding whether to sanction a party for the spoliation of evidence, courts have considered a variety of factors, two of which generally carry the most weight: (1) the degree of culpability of the party who lost or destroyed the evidence; and (2) the degree of actual prejudice to the other party." *Blangsted*, 642 F. Supp. 2d at 1260.

<h2 align="center">ANALYSIS</h2>

*Failure to Preserve the Fire Scene*

Whether Plaintiffs had a duty to preserve the fire scene is a close question. According to J.D.I., Fairfield and Axis were not only aware of, but were contemplating litigation from the very beginning. (Mot. at 12.) J.D.I. points to the insurance adjuster's report, dated February 7, 2008 but based on the initial visit to the site on January 14, 2008, in which the adjuster discusses the subcontractor agreement with J.D.I. and notes a "good potential for subrogation." (Mot., Ex. D at 3.)

J.D.I. also references National Fire Protection Association (NFPA) publication 921 and standards promulgated by ASTM International, which J.D.I. contends establish well-known industry standards for fire investigations. With regard to spoliation, § 11.3.5 of NFPA 921 states that spoliation may occur when "the alteration of the scene significantly impairs the opportunity of other interested parties to obtain the same evidentiary value from the evidence as did any prior investigator." (Mot., Ex. L.) ASTM E 860-07 recommends that other interested parties be notified before evidence is altered or destroyed, so that they may be given the opportunity to participate or

witness and record such actions. (*Id.*, Ex. M. at ¶¶ 5.2 to 5.2.3.) J.D.I. notes that Plaintiffs had a cause and origin investigator on site within two days after the fire. J.D.I. asserts that Plaintiffs' conduct is particularly egregious because both a certified fire investigator and a sophisticated insurance company would be familiar with industry standards for preserving evidence in fire investigations. Nevertheless, J.D.I. says, clean-up of the site began on January 16, 2008 and was substantially complete by the time J.D.I. received official notice of the subrogation claim on February 12, 2008. (Mot. at 5.)

Plaintiffs respond that J.D.I. knew, as early as the day of the fire, that its activities were suspected of causing the fire. Atencio's report indicated that an Arapaho County Sheriff's Deputy had gathered all of the individuals who were inside the structure when the fire was reported and had been informed that they were drywalling inside the building and using temporary propane heaters on the second and third floors. (Mot., Ex. A at 1.) Antonio Maximo, J.D.I.'s foreman, testified at his deposition that he had told the police that J.D.I. was on the second floor, but he did not know if anyone else was in the building. (Resp., Ex. B at 53:20-54:1.) Maximo also stated that he spoke with J.D.I. principal Alson Mowdy about the fire that same day. (*Id.* at 66:1-3.) At his deposition, Mowdy confirmed that he spoke with his foreman that day. (*Id.*, Ex. C at 109:25-110:5.) Mowdy also called the fire marshal after reading in a Colorado paper that the drywallers had supplied the heaters that had caused the fire because he did not want the papers reporting that they were J.D.I.'s heaters. (*Id.* at 113-116.) Plaintiffs contend that J.D.I. could and should have notified its insurance carrier immediately, which could have arranged to view the fire scene. (Resp. at 5.) Plaintiffs note

that Defendant did not notify its insurer until eight days after it received formal notice of claim from Plaintiffs' counsel. (*See* Resp., Ex. D.)

In reply, J.D.I. denies that it was aware of a potential claim based on suspicion that it caused the fire. As J.D.I. points out, Mowdy further testified at his deposition that he believed that stucco workers were on site the day of the fire and that his crew had told this to fire investigators and that he believed that the stucco workers may have moved the heaters on the third floor. (Resp., Ex. C at 105-112.) Moreover, J.D.I. explains, it believed that it was covered as an insured under Fairfield's Builder's Risk Policy with Axis and therefore had no reason to conduct an investigation independent of the investigation undertaken by Axis' investigation team. (Reply at 2.) In addition, because Fairfield was cited for violating the fire code, J.D.I. contends that it reasonably assumed that Fairfield, not J.D.I., was responsible. (*Id.*) Finally, J.D.I. points out that the fact that it did not notify its insurer until eight days after receiving notice of the subrogation claim is inapposite to the question of whether Plaintiffs failed to preserve the fire scene, as the clean-up work was already substantially complete by the time Plaintiffs gave J.D.I. notice of the subrogation claim. (*Id.* at 4.)

While it clearly would have been prudent for J.D.I. to notify its insurer immediately following a major incident at a worksite, such as this fire, the focus of the spoliation analysis is on whether the Plaintiffs had a duty to preserve the scene. As the insurance adjuster's report indicates, Axis was considering a subrogation claim within weeks of the fire. (Mot., Ex. D.) Common sense dictates that Plaintiffs began investigating coverage and subrogation options the very day of the fire. Indeed, Plaintiffs emphasize in their response that "everyone at the scene [on the day the fire

7

occurred]—Fairfield, J.D.I., the authorities, even the local newspapers—knew that the working theory was that the fire was caused by J.D.I." (Resp. at 7) and Plaintiffs have never suggested that they too believed that the actions of J.D.I. would be covered by Fairfield's Builder's Risk Policy with Axis.

While Plaintiffs very quickly knew of a subrogation claim, they also very quickly ordered restoration of the site. J.D.I. suggests that clean-up began on January 16, 2008, although the invoice that J.D.I. cites as evidence of this establishes only that the work was nearing completion by February 12, 2008; it does not establish a start date. (*See* Mot., Ex. G.) Nevertheless, given the work invoiced—cleaning and ozone of building 7, ozone of building 5, dismantle of scaffolding, cleaning of debris on exterior and interior of building 6, install of shoring per engineer—one can infer that the clean-up must have commenced shortly after the fire. It is undisputed that clean-up was substantially complete before Plaintiffs formally noticed J.D.I. of the subrogation claim and thus the scene was not preserved.

Plaintiffs' insurance adjuster began investigating the fire the day after it occurred and Plaintiffs hired a cause and origin investigator who visited the site two days after the fire. Within weeks, the adjuster issued a report noting the "good possibility of subrogation." Clearly Plaintiffs knew or should have known very early on of the potential for ligation. Plaintiffs mention, in passing, that the scene was structurally unsound. (Resp. at 2.) However, they provide no evidence of this or of an immediate need to clean-up the site and begin restoration. Given this short time frame, it appears that Plaintiffs did have a duty to preserve the fire scene until they notified J.D.I.

of the subrogation claim and allowed J.D.I. a reasonable opportunity to perform its own site inspection.

Nonetheless, even assuming that Plaintiffs should have preserved the fire scene, sanctions are not appropriate as J.D.I. has not established prejudice. First, the same evidence is available to all parties. Plaintiffs' testifying cause and origin expert, Robert Toth, did not inspect the site until May 5, 2008. (Mot., Ex. I at 5.) Because the site had been cleaned up by that time, J.D.I. acknowledges that Toth had to rely on photographs of the site and the fire investigator's report for his information.[2] (Mot. at 5 (citing Ex. I at 5-6).) This is the same information available to J.D.I.'s cause and origin expert, Michael Higgins. (Mot., Ex. N. at 2-3.) J.D.I. has not explained how it is prejudiced when Plaintiffs' testifying expert did not have the benefit of reviewing any materials that J.D.I.'s expert did not review.

Second, J.D.I. has not established a reasonable probability, based on concrete evidence as opposed to a "fertile imagination," that inspection of the site would have produced favorable evidence. The favorable evidence J.D.I. imagines might have existed would support an alternate theory of causation based on a propane leak and possible explosion as the source of the fire. As "concrete evidence," J.D.I. points to a hearsay statement by Fairfield employee Nathan Myers, in which he told fire investigators that Fairfield had previously returned multiple heating units to Neff

---

[2] J.D.I. points out that Michael Ness, Plaintiffs' consulting cause and origin investigator, was on scene within days but does not suggest that he obtained evidence for Plaintiffs which was not available to J.D.I.. (*See* Mot. at 6, 11.) Although J.D.I. cites an evidence release form executed by Ness (Mot., Ex. E), he clarified at the hearing that the heaters he took into his possession were exemplars and not the source of origin heater.

Rentals because of propane leaks. (Mot., Ex. C. at 7.) J.D.I. also attaches an affidavit by Higgins in which he interprets three photographs from the scene as suggesting that an explosion must have occurred at the brass fitting on the bottom of the suspect heater and that the fire originated at floor level. (Reply, Ex. 1 at 2.) J.D.I. characterizes Higgins' interpretation as supporting a theory that the fire resulted from a propane leak from the valve or the fitting on the tank, although Higgins' affidavit does not mention errant propane. (*See* Reply at 5.)

This evidence does not establish a reasonable probability that a site inspection would have produced evidence favorable to this defense. No one who inspected the scene found evidence suggesting that a propane leak could have been a cause of the fire. Atencio testified that nothing he saw led him to suspect propane as the cause of the fire. He saw evidence that proximity to combustible materials was the cause and evidence of propane venting due to the fire. He further testified that, had he seen any evidence that propane was the cause, he would have tagged and taken that piece of physical evidence. With regard to the damage Higgins noted on the brass component, Atencio stated that it could have been caused by falling materials or the high pressure water used by the fire department to put out the fire. Ness, the only other investigator to visit the site within days of the fire, also testified that he saw nothing to make him believe that propane components were involved. He did not see regulators close to the origin but did see regulators on other tanks. He did not retain any tanks, hoses or regulators as evidence because they were not the point of origin of the fire.

At the evidentiary hearing, Myers testified that he always tested the rental equipment when it first arrived from Neff Rentals to determine whether there were any propane leaks. If any leaks were found, the equipment was returned and replaced immediately. Myers' testimony suggests that leaking heaters were never put into use in the building.

Notably, there is no record that Higgins considered propane to be a possible cause of the fire prior to the affidavit attached to J.D.I.'s reply brief. He did not mention the theory in either his expert report or his deposition. An irregularity in Higgins' expert report, which surfaced at the evidentiary hearing, requires some preliminary treatment. One version of Higgins' report, dated October 1, 2009, is attached as Exhibit N to J.D.I.'s motion. Under the heading "Summary and Conclusion" Higgins concludes, "[i]t is our opinion it is possible the fire originated at the DSEA [sic] propane convection heater as determined by South Metro Fire Rescue." (Mot., Ex. N at 11.) When asked about this conclusion on cross-examination, Higgins read the following language from a different version of the report, which he had with him on the witness stand: "It is our opinion it is possible, *but not necessarily probable*, the fire originated at the DESA propane convection heater as determined by South Metro Fire Rescue" (emphasis added). This second version of the report is also dated October 1, 2009. It is attached as Exhibit A to Higgins' Affidavit, which is Exhibit 3 to J.D.I.'s reply brief. Plaintiffs' counsel represented that he had never received the second version of Higgins' report containing the probability qualifier, and Higgins struggled to explain the discrepancy. The inconsistency undermines the credibility of both Higgins and his report. Because Plaintiffs had not seen the second version before cross-examination at the evidentiary hearing, the court will not consider it; for purposes of deciding this motion, the court will only consider the

11

version of Higgins' report, attached as Exhibit N to J.D.I.'s motion, which states, "it is possible the fire originated at the DSEA [sic] propane convection heater."

Although Higgins mentions that he was unable to document burn patterns inside the building in spite of some 370 photographs and determine whether all other potential causes of the fire could be eliminated, he never suggests in his report that propane leaking into the atmosphere from a heater could have been a potential cause. (*See* Mot., Ex. N at 5.) Indeed the report's analysis focuses on the fire investigator's conclusion regarding the proximity of the heater to combustible materials. The report concludes that, in order to ignite the wood framing, the propane heater would need to be positioned within six inches of the combustible materials and operated at the highest temperature setting. (*Id.* at 11.) Because Higgins was unable to conduct destructive testing on the heater, he was unable to determine the temperature setting of the heater at the time of the fire. (*Id.*) The court notes, however, that the heater itself has been retained as evidence in the case. While the report states that "[t]he South Metro Fire Rescue photographs . . . did not display definitive evidence the ignition source of the fire was the DESA temporary space heater," it never mentions any damage to the brass components depicted in the photos later attached to Higgins' affidavit. (*Id.*) Nor did Higgins raise any concerns regarding propane in his deposition. In fact, he acknowledges that the heater was closer to combustible materials than was allowed and that appears to be what caused the fire. (Resp., Ex. E at 78:11-18.)

Higgins' report emphasizes the fire investigation standards of NFPA 921 and concludes that, by not preserving the scene, Fairfield did not comply with the requirements of NFPA 921. However,

at his deposition, Higgins stated that he had "done other fires with this group of people [and thought] that they're competent investigators." (*Id.* at 37:16-22.) He also agreed that he had confidence in the fire department's conclusion with regard to where the fire originated. (*Id.* at 37:23-24.) At the evidentiary hearing, Plaintiffs' counsel paraphrased NFPA 921 as providing that a proper impartial investigation and documentation of the scene by an impartial party is sufficient to rely upon to reach conclusions regarding the cause of the fire. Higgins agreed and confirmed that he was not suggesting that Atencio was anything but impartial in his investigation. Higgins also agreed that, based on NFPA 921, a conclusion regarding the cause of the fire could be reached with the information he had although he expressed concern, personally, with reaching a conclusion without observing the scene himself.

Based on the weak evidence cited by J.D.I. and the testimony at the evidentiary hearing, the possibility that a site inspection by J.D.I. would have uncovered concrete evidence of a propane leak is pure speculation and not a reasonable possibility. Because J.D.I. has failed to show prejudice as a result of Plaintiffs' failure to preserve the scene, sanctions are not warranted.

*Failure to Preserve Propane Components of Origin Heater*

With regard to the heater's propane components, J.D.I. has not proven that Plaintiffs failed to preserve the evidence. In fact, the location of the propane components appears to be a source of confusion for both parties. In its motion, J.D.I. avers that "[d]espite diligent efforts [it] has been unable to locate the propane tank, the fittings or the pressure regulator from the implicated heater . . . ." (Mot. at 3.) J.D.I. also asserts that "[d]espite repeated requests to Fairfield, Fairfield has been

13

unable to produce the propane tank, the fittings or the pressure regulator from the tank . . . ." (*Id.* at 5.) As evidence, J.D.I. provides an email dated January 14, 2010, long after the close of discovery, in which defense counsel states, "after reviewing all of the mandatory disclosures, investigative reports and expert disclosures, it appears to me that the propane tank and regulator from the suspect heater were not preserved" and asks Plaintiffs' counsel to confirm. (Mot., Ex. K.)

In response, Plaintiffs represent that they returned the items in question to Neff Rentals. (Resp. at 3.) Plaintiffs contend that J.D.I. made no effort to secure them from Neff Rentals and did not depose Neff Rentals, serve them with a subpoena or even make an informal request for the items during the discovery period. (*Id.*) Fact discovery closed on September 15, 2009. (Doc. 34.) Plaintiffs also note that the January 14, 2010 email was sent two years after the fire, and "appears to be the first such request for the referenced equipment." (Resp. at 5.)

J.D.I. replies that it was operating under the belief that the fire investigator from South Metro Fire Rescue had taken possession of the tank, fittings and valve and did not learn until March 2010 that South Metro did not have possession of the tank and related parts. (Reply at 4-5.) J.D.I. does not explain why it would have sought the components from Fairfield in January 2010 if it was operating under the belief that South Metro had the components until March of 2010.

In response to questing by defense counsel at the evidentiary hearing, Atencio testified that he did not remember personally receiving any phone calls or emails from J.D.I. or defense counsel requesting this evidence. He indicated that the proper method of obtaining evidence is through a written request. J.D.I. provided no proof of any request for evidence to South Metro Fire Rescue.

Interestingly, and apparently unexpectedly, former Fairfield employee Myers testified that, following the fire, all of the heaters and parts from the building that burned were put in a locked enclosure at the construction site. This included the heaters, lines and ten propane tanks. According to Myers, all the items were still locked in this enclosure when he left Fairfield in May 2009 because noone ever asked for them. He does not know what happened to them after May 2009 but testified that the items and enclosure would have to be removed before the building passed inspection.

The burden is on J.D.I. to prove by a preponderance of the evidence that Plaintiffs failed to preserve evidence or destroyed it. While Myers' testimony exposes some confusion on Plaintiffs' part regarding what was done with the propane components following the fire, J.D.I. has not established by a preponderance of the evidence that Plaintiffs failed to preserve or destroyed the evidence. In fact, there is no evidence regarding what was done with the heaters, lines and tanks after May 2009. J.D.I. did not seek discovery of the propane components from Plaintiffs before discovery closed on September 15, 2009 and there is no record of Plaintiffs response to J.D.I.'s email inquiry of January 14, 2010. Simply put, J.D.I. is seeking sanctions for spoliation of evidence that it did not request from Fairfield until two years after the fire and which could still exist, and apparently, actually did exist for most of the discovery period. J.D.I. has not provided evidence of its destruction or that Plaintiffs otherwise failed to preserve it.

J.D.I. argued at the evidentiary hearing that the mandatory disclosure requirement of Federal Rule of Civil Procedure 26 places the obligation on Plaintiffs to disclose that they had possession of the propane components. Rule 26(a) requires a party to disclose "tangible things that the

disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment." FED. R. CIV. P. 26(a)(1)(A)(ii). "May use to support its claims or defenses" is the crucial language here. The Advisory Committee Commentary to the 2000 Amendments notes that "[t]he initial disclosure obligation of subdivisions (a)(1)(A) and (B) [was] narrowed to identification of witnesses and documents that the disclosing party may use to support its claims or defenses" and that "[a] party is no longer obligated to disclose witnesses or documents, whether favorable or unfavorable, that it does not intend to use." FED. R. CIV. P. 26(a)(1) advisory committee's note to 2000 Amendments.

Plaintiffs contend that the cause of the fire–a propane heater placed too close to combustible materials–is clear. They maintain that they had no reason to believe that the propane tanks and connectors were relevant to this litigation. (Resp. at 11.) Because Plaintiffs are not pursuing a theory involving leaking propane, they had no obligation under Rule 26 to disclose possession of the propane components, which they do not intend to use to support their claims. Further, it was not until very late in the case, after the close of discovery, that anyone suggested the component parts might have relevance to any fire origin theory.

J.D.I. has not proven that Plaintiffs failed to preserve the propane components. As with J.D.I.'s argument regarding Plaintiffs failure to preserve the fire scene, even assuming that Plaintiffs did not preserve the propane components, J.D.I. has not established that it is prejudiced by the loss or destruction of this evidence.

J.D.I. claims that

16

> [w]hether the tank at issue leaked, and whether such a leak cause [sic] or contributed
> to the fire, could only have been determined by an inspection and testing of that very
> tank, its components and the fire scene. These components were the most critical
> pieces of evidence in the case and its [sic] loss is squarely the responsibility of the
> Plaintiff [sic]. The prejudice to JDI can never be overcome.

(Mot. at 13.) As with the evidence from the scene itself, J.D.I.'s contention that the propane components could have provided favorable evidence is premised on the idea that other heating units had leaked. As discussed above, neither Myers' statement that Fairfield had returned heaters in the past because of leaks, nor Higgins' affidavit, pointing to three photos that might suggest an explosion in the brass fitting, constitute concrete evidence to support a reasonable probability that the propane components would provide favorable evidence. Accordingly, J.D.I. has not established prejudice.

## CONCLUSION

J.D.I. has not met its burden to obtain sanctions for spoliation of evidence. It has not shown that Plaintiffs failed to preserve the propane components and has not shown that it is prejudiced either by its inability to inspect the scene of the fire or by its inability to examine the propane components. J.D.I.'s Motion for Sanctions for Spoliation of Evidence (Doc. No. 92) is therefore denied.

Dated this _30_ day of _July_, 2010.

BY THE COURT:

Kathleen M Tafoya
United States Magistrate Judge

17